Michael STORMONT, Appellant,

v.

ASTORIA LIMITED, an Alaska
Corporation, Appellee.

No. S–5455.

Supreme Court of Alaska.

Feb. 17, 1995.

Michael Stormont, pro se.

James D. DeWitt and Michael Stephan
McLaughlin, Guess & Rudd, Fairbanks, for
appellee.

Before MOORE, C.J., RABINOWITZ,
MATTHEWS and COMPTON, JJ., and
BRYNER, J. Pro Tem.*

## OPINION

RABINOWITZ, Justice.

In April 1992 Michael Stormont signed a
lease and an option to purchase real proper-
ty, including an eleven-unit apartment com-
plex and house (the property), from Astoria
Limited (Astoria). These documents re-
peatedly reiterate that Stormont accepts the
property "as is." In May, a city inspection
determined that the building was a "danger-
ous and substandard building," and in June a
building inspector sent Stormont notice that
the property would have to be vacated and
demolished. Stormont sought rescission of
the lease and option on the basis of mistake,

* Sitting by assignment made pursuant to article   IV, section 16 of the Alaska Constitution.

frustration and misrepresentation. He also sought reliance damages, averring that he had expended considerable time and money renovating the property. Astoria counterclaimed for past due payments under the lease. The superior court granted summary judgment in favor of Astoria, and Stormont appealed. We affirm.

## I. *FACTS AND PROCEEDINGS*

In 1987 a predecessor in interest to Astoria owned the property. On June 11, 1987, a Fairbanks building official sent the predecessor a Notice and Order describing deficiencies in the disputed property, ordering repair, and threatening punishment by fine or imprisonment.

In 1991 Astoria purchased the property. On April 6, 1992, Stormont and Astoria executed the lease and option to purchase. According to both parties, it was immediately evident to anyone who inspected the apartment building and house that they were badly deteriorated and required extensive repair to be habitable. Astoria claims that it had no knowledge of the 1987 letter.

Both the lease and the option contain "as is" clauses. Four separate terms of the lease include the following language: "It is understood and agreed by both Landlord and Tenant that Tenant accepts said unit in 'as is' condition...." The lease also states that Stormont assumes the risk of any improvements undertaken.

The option to purchase states that "[t]he property is sold in 'As Is' condition with no representations or warranties except those set out in this agreement." The term covering "Seller's Warranties" states that "[t]he Seller makes no warranties or promises regarding the Real Property or the condition of the Real Property, except as are expressly set out in this agreement." The most salient item in the option is "Risks Assumed by Purchaser" which provides, in part, as follows:

    a.  The Purchaser assumes the risk that all or part of the Real Property will be inadequate, inappropriate or unusable for the purposes intended by the Purchaser. Before closing the purchase in accordance with this agreement, the Purchaser will make a thorough and careful examination of the Real Property and assure himself that the Real Property is suitable for the purposes to which he intends to put it, and the Purchaser expressly and unequivocally assumes the risk that subsequent events or undiscovered, unknown conditions will make the Real Property unsuitable for those intended purposes. The Purchaser expressly acknowledges that the real property and improvements are being sold in its present "as is" condition.

    b.  *Improvements.* The Purchaser acknowledges that improvements to the Real Property are not new, but rather are used, and the Purchaser accepts the risk that there may be unknown, and even undiscoverable defects to the improvements to the Real Property.

In a section entitled "Other," one of the final terms of the option agreement once again acknowledges the absence of any warranties relating to the property.

Stormont allegedly spent 240 hours and either $2,500 (according to his affidavit) or $20,000 (according to his brief) working on the premises. On June 2, 1992, the City of Fairbanks notified Stormont that the apartment complex would be demolished. The inspection resulting in the condemnation notice was undertaken specifically to confirm whether the property was in compliance with the earlier Notice and Order.

Neither Astoria nor Stormont had any indication that the City might order demolition; the condemnation came as a surprise to both parties. Though Stormont admits that he realized the property "would need a lot of repair work," he contends that "there is a world of difference between the premises 'needing a lot of work' and the DEMOLITION ORDER ... received from the City." According to Stormont, the parties talked about how to get the apartments "on line," and how to get four units rented so that Stormont could receive rent while working on the other units. Additionally, Astoria provided Stormont with sample lease agree-

ments and eviction notices and gave guidance on how much rents should be.

Stormont filed a complaint against Astoria, alleging that Astoria had intentionally misled Stormont about the condition of the building. He requested damages for his expenditures on the building and rescission of the lease and option agreements. In the alternative, he asked for damages for fraud and breach of implied obligations. He later amended the complaint to allege misrepresentation,[1] mutual mistake and frustration of purpose. Astoria answered and filed a counterclaim to recover past due payments under the lease agreement. Astoria later filed a motion for summary judgment. The superior court entered summary judgment in favor of Astoria on Stormont's complaint, and on Astoria's counterclaim. This appeal followed.

## II. STANDARD OF REVIEW

■ We will affirm summary judgment only when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992). This court reviews *de novo* summary judgments based upon interpretation of a contract. *Peterson v. Wirum*, 625 P.2d 866, 871–72 (Alaska 1981). All reasonable inferences are drawn in favor of the non-moving party. *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

## III. ARGUMENTS

### A. Mutual Mistake

Stormont's discussion of the mistake issue apparently embodies three allegations of mistake: (1) a belief that the structure would not be demolished; (2) a belief that the apartments were in better condition at the time of the agreement than they in fact were; and (3) a belief that there had not been a condemnation order.[2]

■ When the parties to an agreement share a mistaken belief about a material fact, the agreement may be voidable. *See* Restatement (Second) of Contracts § 152 (1981). The Restatement sets forth three requirements for a successful mistake argument. The party seeking to void the contract must prove that (1) the mistake relates to a "basic assumption on which the contract was made," (2) the mistake has a material effect on the agreed exchange of performances, and (3) the party seeking relief does not bear the risk of the mistake. Restatement (Second) of Contracts § 152 cmt. a (1981).

■ The first mistake Stormont alleges is that at the time of the signing neither party anticipated the imminent demolition order which was sent on June 2, 1992. The order was a result of an inspection by the Fairbanks Building Department on May 29, 1992. However, this error does not qualify as a mistake justifying rescission because it concerns a future event. *See Beals v. Tri–B Assocs.*, 644 P.2d 78, 80 (Colo.App.1982) ("If the parties harbor only mistaken expectations as to the course of future events and their assumptions as to facts existing at the time of the contract are correct, rescission is not proper."); Restatement (Second) of Contracts § 151 cmt. a (1981).

Stormont also alleges that the parties did not know how severe the building's problems were at the time they signed the agreements. The first question is whether this acknowledged mistake relates to a fundamental assumption underlying the contracts. The property was listed as "income property," and Stormont was interested in it for its rental value. Thus, assumptions about the building's suitability for commercial leasing (i.e. its habitability) went to the heart of the contracts.

■ The second requirement is that the mistake must have a material effect on the agreed-upon exchange. Stormont has not

1. Although Stormont's complaint raises the issue of misrepresentation, he virtually ignored the argument in both his opposition to summary judgment and his brief on appeal. Therefore, we treat the argument as waived.

2. Although this last argument appears in the complaint, it does not appear in the amended complaint or the memorandum opposing summary judgment. Consequently, Stormont has waived it.

satisfied this requirement because he has not alleged that he received something fundamentally different from what the parties believed he would. Thus, the mistake could not have had a material effect on the agreed exchange of performances.

The third requirement also fails as all the evidence offered suggests that Stormont bore the risk of a mistake as to the condition of the building.[3] Astoria sold the property "as is." *See* Frank J. Wozniak, Annotation, *Construction and Effect of Provision in Contract for Sale of Realty by Which Purchaser Agrees to Take Property "As Is" or in Its Existing Condition,* 8 A.L.R.5th 312 § 14, at 366 ("as is" clause is strong evidence that the risk of mutual mistake has been allocated to the purchaser). As Astoria notes, "this is

3. As to bearing the risk of the mistake, the Restatement (Second) § 154 (1981), states as follows:

   A party bears the risk of a mistake when
   (a) the risk is allocated to him by agreement of the parties, or
   (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
   (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

4. Although the Uniform Commercial Code section 2–316 requirement of conspicuousness does not apply to contracts for the sale of real property,

   [c]ourts do require that at a minimum any disclaimer be written so that it is reasonable to conclude that the buyer has read the language. As in sale of goods cases, this means that the size of the print, location of the clause in the contract, and whether it is in bold or contrasting color is relevant to that determination.

   Frona A. Powell, *Disclaimers of Implied Warranty in the Sale of New Homes,* 34 Vill.L.Rev. 1123, 1141–42 (1989).

   While there are a number of exceptions, courts generally enforce "as is" clauses. *See* Wozniak, *supra,* § 2[a], at 327.

5. Traditionally, American law gave great weight to the principle of caveat emptor. *See* Nicola W. Palmieri, *Good Faith Disclosures Required During Precontractual Negotiations,* 24 Seton Hall L.Rev. 70, 74 (1993). This meant that courts would often refuse to penalize nondisclosure of material information even without an as is clause. *See id.* The term caveat emptor emerged in England in the sixteenth century. *Id.* at 110. And it has always been in tension with an older notion, that of dealing in good faith,

not a case of a single 'as is' clause buried in the middle of fine print."[4] Although caveats are more prevalent in the option than in the lease, the agreements are substantially interrelated, the parties executed them at the same time, and they should therefore be construed together. *Sea Lion Corp. v. Air Logistics of Alaska,* 787 P.2d 109, 115 (Alaska 1990). Moreover, the parties discussed the condition of the building, and Stormont had opportunities to inspect it.[5] By signing the contracts, Stormont treated his knowledge of the building's condition as adequate. He does not allege that Astoria concealed significant information from him.[6] Nor does he assert that the defects were hidden. *See* Wozniak, *supra,* § 5, at 328 (some courts have even relied on as is clauses to bar

which has existed as an ideal for as long as humans have interacted, and which was developed extensively in Roman Law. *See id.* at 80–81. Before the relatively recent appearance of caveat emptor, sellers generally took strict responsibility for what they sold. *Id.* at 110. "Eventually, however, the combination of increased geographic mobility, changing economic and social demographics, the rise of trade and the weakened grip of the Church on society contributed with other factors to the advent of caveat emptor." *Id.* at 111.

The appeal of caveat emptor began to fade by the beginning of the twentieth century. *Id.* at 112. America began to put in place a regime of enforced good faith, particularly with regard to goods. *Id.* at 112–14. States have adopted the UCC and other laws, and expanded the scope of common law liability, for example by applying strict liability to injuries resulting from defective goods. *Id.*

Unlike the law governing the sale of goods, however, real property law has largely remained sympathetic to caveat emptor. There have been protections for buyers, such as the implied warranty of habitability for new homes. *See id.* at 114–15. And some courts have created exceptions to caveat emptor when material misrepresentations have been made. *See id.* at 115 n. 163; *see also* Wozniak, *supra,* §§ 4–8 (courts generally do not allow as is clauses to preclude actions for fraudulent concealment of defects).

6. *See* Wozniak, *supra,* § 2[2], at 328 ("[I]t has generally been held or recognized that an 'as is' provision in a contract for the sale of realty does not bar a vendee's claim based on allegations of fraud, misrepresentation, or nondisclosure."). Since Stormont has not sufficiently argued fraud, misrepresentation, or nondisclosure, we need not determine the effect of an as is clause where any of these circumstances have been shown.

actions based on fraud claims when defects were patent). Additionally, the fact that he was an experienced contractor at the time weighs against him. We hold that Stormont has not made out a case for relief based upon mistake.

### B. *Frustration*

■ Stormont argues that he is entitled to judgment as a matter of law based on the doctrine of frustration of purpose, or that at a minimum there is a genuine issue of material fact that precludes summary judgment in favor of Astoria on this issue. Frustration is an affirmative defense, and Stormont bears the burden of proof.

Allocation of risks is an important consideration when a party pleads frustration.[7] That factor weighs against Stormont. The agreements did not explicitly mention demolition or condemnation. However, under the agreements, Stormont assumed the risk that the building would not be suitable for his purposes due to unknown or undiscovered defects. Thus, we conclude that Stormont has not met his burden of proving frustration.

## IV. CONCLUSION

The superior court's grant of summary judgment in favor of Astoria is AFFIRMED.

---

**7.** Under the Restatement (Second) of Contracts § 265,
> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Comment A notes three requirements implicit in this statement:
> First, the purpose that is frustrated must have been a principal purpose of that party in making the contract.... Second, the frustration must be substantial.... The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

The Comment further notes that foreseeability is an important component of the third factor.

We have adopted the Restatement's test for frustration. *See U.S. Smelting, Ref. & Mining Co. v. Wigger*, 684 P.2d 850, 857 (Alaska 1984).